Country Mutual Insurance Company, a Corporation, Plaintiff-Appellant, v. Wilbur J. Bergman and Curtis G. Cooper, Administrator of the Estate of Gary Curtis Cooper, Deceased, Defendants-Appellees.

Gen. No. 10,374.

Third District.

October 22, 1962.

Barth, Phillips, Phebus & Tummelson, of Urbana (Darius E. Phebus and Hurshal C. Tummelson, of counsel), for appellant.

Summers and Watson, of Champaign and Mathis, Turnbow & Mathis, of Rantoul (Robert C. Summers and Robert A. Mathis, of counsel), for appellees.

ROETH, JUSTICE.

Plaintiff filed suit in the Circuit Court of Champaign County asking for a declaratory judgment as to whether Wilbur J. Bergman, holder of a certain automobile public liability and property damage policy of the plaintiff, was covered by said policy. The complaint alleged in substance that plaintiff had issued to Wilbur J. Bergman a certain automobile liability insurance policy; that Wilbur J. Bergman was involved in a collision while operating his automobile, in which collision Gary Curtis Cooper, a passenger in the Bergman car, was killed; that the administrator of the estate of Gary Curtis Cooper has filed suit under the Wrongful Death Act against Wilbur J. Bergman; that at the time of the collision Bergman was operating his automobile in a prearranged race or competitive speed test; and that by virtue of certain policy exclusions, plaintiff's policy does not cover the occurrence in question and it is not bound to defend the suit of Cooper's administrator against Bergman. The answers of the defendants in substance deny that Bergman was operating his automobile in a prearranged race or competitive speed test and in addition assert that the exclusions relied upon by plaintiff refer only to a prearranged race or competitive speed test of a commercial or business variety where profit or gain is available to the winner and the hope and aim of the participant.

The case was submitted to a jury solely on the question of whether Bergman was engaged in a

269

prearranged race or competitive speed test. From an examination of the record, no attempt was made by the trial court to construe the exclusion clause relied upon by the plaintiff, prior to submission of the case to the jury, and no instruction was given to the jury as to what was meant by the phrase "prearranged race or competitive speed test" so as to afford the jury some basis for determining whether the factual situation as presented to it was a prearranged race or competitive speed test within the meaning of that phrase. What is meant by the phrase "prearranged race or competitive speed test" was a question of law to be determined by the court. Thompson v. Fidelity & Cas. Co. of New York, 16 Ill App2d 159, 148 NE2d 9. The jury returned a verdict finding the issues for the plaintiff. Thereafter, on post-trial motion the court set aside the jury's verdict and entered a declaratory judgment order providing in part as follows:

"The Court having further considered said matter and having heard further arguments of counsel finds that said policy of insurance is ambiguous in the terms of the exclusion hereinabove set forth, and that in view of said ambiguity in the terms of said policy, the Court finds that said provisions should be construed most strongly against the plaintiff.

"The Court further finds that said exclusion refers solely to prearranged races or tests of speed such as stock car races or sports car races on a regularly laid out track and set at a specified time, and that said exclusion in law refers only to automobiles operated in such a sports contest for which profits, awards and gains are available to the winner.

"The Court further finds notwithstanding the verdict of the jury in said cause that Wilbur J. Bergman did not operate his automobile on April

270

24, 1960 in such fashion as to come within the exclusion in said policy of insurance hereinabove set forth."

The trial court thereupon declared in substance, that the exclusion relied upon by plaintiff, did not apply to the factual situation presented and therefore did not exclude coverage to Bergman.

The factual situation as presented to the jury reveals the following. The collision occurred approximately two miles north of Fisher, Illinois, on what is known as the Foosland Road. There are two short curves just north of Fisher, and the road then runs straight north for a distance of about two miles to the crest of a hill where the collision occurred. The road was then concrete on the west half, about nine feet wide, and black top or black top surface on the east half. A few minutes before the collision, the car of Bergman was alongside the car driven by Hieser, near Fisher High School in Fisher, Illinois. At that time they were side by side, the Bergman car headed to the north and the Hieser car headed to the south. One William Moore was in the front seat of the Bergman car and Gary Cooper was in the rear seat. Hieser was alone in his automobile. They talked a few minutes. A short time later, according to Bergman's testimony, he drove out on the Foosland road, and stated that the Hieser car passed him just out of the north limits of Fisher and that he never did pass the Hieser car but was attempting to pass it at about 300 feet from the crest of the hill. He estimated his speed at not over 75 miles per hour. He denied having any conversation with Hieser about a race. He admitted driving on the left side of the road.

William Moore testified he was in the Bergman car and that the occupants of the two cars talked to each other near the school. Although it is not clear by the testimony of this witness when or where the Hieser

271

car passed the Bergman car, he did testify that Bergman was attempting to pass the Hieser car at the time of the collision. He didn't remember stopping just out of Fisher.

Roger Hieser denied stopping his car outside Fisher, but admitted stopping by the side of the Bergman car in Fisher and talking. He next saw Bergman near some stop signs, at the north limits of Fisher. Hieser said Bergman was coming out west and started after he, Hieser, had left the stop sign. He didn't remember if Bergman tried to pass his car, was not sure if Bergman did pass his car, but if so, it was just a little ways. He didn't remember if he signed a statement that he was sitting side by side with Bergman's car and that Bergman wanted to race and that they proceeded to a point north of Fisher where they lined up with the Bergman car on the left side of the road and his car on the right side or east side of the road. Hieser estimated his speed at 70 to 75 miles per hour.

Bergman, Moore and Hieser were vague as to most of their evidence. They couldn't remember or recall as to many questions that were asked. However, all three of them were positive there was no agreement to race and no conversation about a race.

Air Force Sergeant Oliver L. Franklin, who lived on the Foosland Road at the crest of the hill where the collision occurred, saw the Bergman automobile and the Hieser automobile just north of the stop signs at the north limits of Fisher. He watched them maneuver the two automobiles into position side by side and then take off with motors racing and at such speed as to leave black tire marks on the pavement. He drove north on the Foosland Road and watched the two cars as they proceeded side by side, Bergman in the left or southbound lane and Hieser in the right or northbound lane toward the hill crest where the collision occurred. He estimated the speed of the two automobiles at 85 to 90 miles per hour. His testimony

was that they stayed side by side until the accident at the crest of the hill when the Bergman automobile seemed to blow up. On cross-examination he stated the two automobiles were abreast all the way up the road, except at the moment of impact of the Bergman car with the Shaw car when, he thought, the Hieser automobile seemed to be just a little bit ahead of the Bergman automobile.

Virginia Franklin, wife of Oliver Franklin, was riding in the front seat with her husband, with their little girl in between them. She corroborated her husband's testimony except she did not testify as to the maneuvering for position. She heard the motors racing, saw the two automobiles take off at great speed, saw the two automobiles travel side by side until they approached the hill and at that point it seemed to her the Hieser automobile was a little ahead.

Michael Hieser, a cousin of the father of Roger Hieser, testified he heard the noise of the two automobiles which he described as loud, and watched the crest of the hill and saw the two automobiles, one in each lane, side by side, coming over the hill, and observed them up to the collision.

Marion Hoffman, who was at his mother's home just off the Fisher-Foosland Road, saw the two automobiles traveling side by side at a speed he estimated at 85 miles per hour or faster.

Helen Hoffman, wife of Marion Hoffman, testified that she saw the two automobiles and that they were side by side and going fast, and the noise of their motors was loud. The important question for our determination is whether the foregoing factual situation is within the contemplation and language of the exclusion in plaintiff's policy.

■ Section I of the policy in lines 1 to 21 inclusive provides for the coverage by the terms of which plaintiff agrees to pay on behalf of the insured all sums which the insured shall become legally obligated to

pay as damages, etc. Lines 96 to 125 inclusive cover the exclusions from liability as follows:

"96 EXCLUSIONS UNDER SECTION I

97 This policy does not apply under Section I:

(1) to any automobile while used as a public or livery conveyance, or while being operated in any prearranged race or competitive speed test, or while rented or leased to others.

(2) to bodily injury or property damage caused intentionally by or at the direction of the Insured.

(3) to bodily injury, arising out of and in the course of employment, sustained by any person to whom the Insured may be liable under any Workmen's Compensation plan or law.

(4) to bodily injury sustained by any employee of the Insured while engaged in the course of his employment for the Insured.

(5) to the automobile described in the Declarations while used in an Automobile Business, by any person other than the Named Insured.

(6) to a Non-Owned Automobile while used by the Insured in an Automobile Business.

(7) to bodily injury sustained by the Named Insured, his dependent relatives, and any other dependent person to whom the Named Insured stands in the position of a parent, if residents of the Named Insured's household.

(8) to injury to or destruction of property owned or transported by the Insured, or

274

123 property rented to or in the charge of the Insured.

124 (9) to liability assumed by the Insured under
125 any contract or agreement."

It is to be noted at the outset, that with the exception of exclusion No. 1, each of the other exclusions refer to a single subject classification. Thus, exclusion No. 2 excluded liability for damage caused intentionally by the insured; No. 3, for any injury covered under Workmen's Compensation Law; No. 4, for any injury sustained by any employee of the insured while in his employment; No. 5, for any injury or damage arising out of use in the automobile business; No. 6 to a non-owned automobile used by the insured in an automobile business; No. 7, for bodily injury sustained by the insured or members of his family or relatives residing in the same household; No. 8, for injury to or destruction of property owned, transported by, or rented to the insured; No. 9, to liability assumed by the insured under any contract or agreement. When exclusion No. 1 is examined we find that it contains not one, but three subject classifications as follows:

 A. An automobile while used as a public or livery conveyance.
 B. An automobile while operated in any prearranged race or competitive speed test.
 C. An automobile rented or leased to others.

The classification A above has been construed to refer to a business or commercial venture. McDaniel v. Glens Falls Indemnity Co., 333 Ill App 596, 78 NE 111. We think it obvious that classification C refers to a business or commercial venture.

Counsel for plaintiff would construe classification B as though it read "any race or speed test." If the plaintiff had intended to exclude an automobile while being operated in "any race or speed test" it would

have been very easy to so provide. Rather, it has seen fit to confine the exclusion to a race which is "prearranged" and a speed test which is "competitive." Further, if plaintiff's contention were to be sustained, i. e., that any race or speed test is contemplated as to classification B, then this classification is entirely out of context with the clause that precedes it and the clause that follows it. Here again if such had been the intention it would have been very easy to separate the exclusion from the classifications which clearly contemplate a business or commercial venture. In Treolo v. Iroquois Automobile Ins. Underwriters, 348 Ill 93, 180 NE 575, the court was called upon to construe an exclusion in an automobile liability policy which excluded coverage if the automobile "is being used for transporting intoxicating liquor." The insured had a jug of wine in the automobile at the time of the collision. The court followed the doctrine of liberal construction in favor of the insured to afford the insured protection by construing the exclusion as meaning engagement in the business of transporting intoxicating liquor. A similar holding will be found in Ferry v. National Motor Underwriters, 244 Ill App 241.

In our opinion the use of the word "prearranged" in referring to any race and the use of the word "competitive" in referring to any speed test lend support to defendant's contention that not all races and all speed tests are contemplated by the exclusion. When the phrase "prearranged race or competitive speed test" is limited to a commercial or business venture, then exclusion No. 1 conforms to the general pattern of the other exclusions, Nos. 2 to 9 inclusive, in referring to single subject classifications. Exclusion No. 1 then becomes a single subject classification, i. e., operation of the automobile in a commercial or business venture whether it be as a livery or public conveyance, or in a prearranged race or competitive speed test or while rented or leased to others.

276

We know of no precedent that assists in the construction of this specific clause so that we are compelled to "plow a furrow" in a previously unplowed field. In so doing we are guided by the general rule laid down in Midwest Dairy Products Corp. v. Ohio Cas. Ins. Co., 356 Ill 389, 190 NE 702, as follows:

"In the interpretation of insurance policies, terms used in the contract, in the absence of ambiguity, must be taken in their plain, usual and popular sense. The insured, when purchasing an insurance contract, seldom has the benefit of legal advice or the assistance of a person versed and trained in the analysis and interpretation of insurance contracts. The circumstances attending the preparation of an insurance contract are different from those usually surrounding other contracts. The company prepares the contract in the absence of the insured or anyone appearing in his behalf. He has no voice in determining or directing the contents of the contract. It is within the power of the insurance company to write the contract as it desires. It selects the words that constitute the contract. If there is a lack of clearness in the meaning of the contract the insurer is responsible therefor. Out of the situation attending the preparation of insurance contracts there have grown several generally recognized canons of construction, viz.:

"In cases of ambiguity that construction of insurance policies will be adopted which favors the insured. Such rule is consistent with both reason and justice. Any fair doubt as to the meaning of an insurance contract should be resolved against the insurer. (Citing cases.)

"Insurance contracts should be liberally construed in favor of the insured. The insured should not be deprived of the benefit of insurance for

277

which he has paid, except where the terms of the policy clearly, definitely and explicitly require it. (Citing cases.)

"Equivocal expressions in an insurance contract whereby the insurer seeks to narrow the range of its liability or renounce the liability purported to be assumed by the contract are to be construed most strongly against the insurer. Where two constructions of the terms of a policy equally reasonable can be obtained from the wording of the insurance contract, that construction will be adopted which enables the beneficiary to recover his loss. (Citing cases.)"

Counsel for defendants also contend that a declaratory judgment action is not available in advance of an adjudication of the issues in the personal injury case and relies most strongly on State Farm Mut. Automobile Ins. Co. v. Morris, 29 Ill App2d 451, 173 NE2d 590. On the other hand, counsel for plaintiff rely most strongly on Farmers Automobile Ins. Ass'n v. Janusick, 30 Ill App2d 352, 174 NE2d 705. Both of these cases were decided in the Second District, one by the second division and the other by the first division. Both opinions were filed on the same day and there would appear to be a conflict between them. A lengthy annotation in 142 ALR 8, supplemented by subsequent holdings, supports the position of counsel for plaintiff. Furthermore, in many Illinois cases decided since the Morris and Janusick cases, the declaratory judgment procedure has been utilized in comparable situations. See Allstate Ins. Co. v. Conglis, 33 Ill App2d 370, 179 NE2d 434; International Harvester Co. v. Continental Cas. Co., 33 Ill App2d 467, 179 NE2d 833; County of Williamson v. Standard Accident Ins. Co., 32 Ill App2d 363, 178 NE2d 149; Allstate Insurance Co. v. Lake Shore Mut. Ins. Co., 33 Ill App2d 172, 178 NE2d 675. We are therefore of

278

the opinion that this contention of counsel for defendants is without merit.

For the reasons hereinbefore announced, the judgment of the Circuit Court of Champaign County will be affirmed.

Affirmed.

CARROLL, J., concurring.

REYNOLDS, P. J., dissenting.